IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

JAVARES ANTONIO LANDRUM,
     Petitioner,

vs.                       Case No.:  3:13cv432/RV/EMT

SECRETARY DEPARTMENT OF CORRECTIONS,
     Respondent.
_____/

## REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's amended petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (doc. 10).  Respondent filed an answer and relevant portions of the state court record (doc. 19).  Petitioner filed a reply (doc. 24).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters.  *See* N.D. Fla. Loc. R. 72.2; *see also* 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72(b).  After careful consideration of all issues raised by Petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a).  It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

I.      BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* doc. 19).[1]  Petitioner was charged in the Circuit Court in and for Escambia County, Florida, Case No. 2009-CF-532, with two counts of robbery with a deadly weapon (Counts 1 and

---

[1] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (doc. 19).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

2), one count of aggravated assault by threat (Count 3), and one count of possession of a controlled substance (less than 20 grams of cannabis) (Count 4) (Ex. A at 1).  Following a jury trial, the court granted a judgment of acquittal on Count 4, and the jury found Petitioner guilty as charged on the remaining counts (Ex. A at 60–61, 172, Ex. B, Ex. C).  He was sentenced as a prison releasee re-offender to concurrent terms of life imprisonment, with a minimum mandatory of life, on Counts 1 and 2, and a concurrent term of five years of imprisonment, with a minimum mandatory of five years, on Count 3, with pre-sentence jail credit of 346 days (Ex. A at 64–77, 92–100).

Petitioner, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D10-860 (Ex. D).  The First DCA affirmed the judgment per curiam on December 3, 2010, with the mandate issuing December 21, 2010 (Ex. F).  Landrum v. State, 48 So. 3d 1021 (Fla. 1st DCA 2010).  The Supreme Court of Florida denied review on June 29, 2011(Ex. G).  Landrum v. State, 66 So. 3d 303 (Fla. 2011) (Table).

On January 18, 2011, Petitioner filed a motion to correct sentencing error, pursuant to Rule 3.800(a) of the Florida Rules of Criminal Procedure (Ex. I).  The state circuit court summarily denied the motion in an order rendered February 3, 2011 (id.).

On August 28, 2011, Petitioner filed a motion for post-conviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. J at 1–23).  On October 25, 2011, the state circuit court struck the motion as facially insufficient, with leave to file an amended motion "within a reasonable time" (id. at 74–76).  Petitioner filed a timely amended motion on December 4, 2011 (id. at 77–110).  The state circuit court summarily denied the motion in an order rendered January 31, 2012 (id. at 177–92).  Petitioner appealed the decision to the First DCA, Case No. 1D12-1044 (id. at 271–73).  The First DCA affirmed per curiam without written opinion on June 8, 2012, with the mandate issuing August 17, 2012 (Ex. K).  Landrum v. State, 94 So. 3d 587 (Fla. 1st DCA 2012) (Table).

On November 5, 2012, Petitioner filed a petition for writ of habeas corpus in the First DCA, Case No. 1D12-5406, alleging ineffective assistance of appellate counsel (Ex. N).  The First DCA denied the petition on the merits on December 7, 2012 (Ex. O).  Landrum v. State, 109 So. 3d 230 (Fla. 1st DCA 2012) (Mem).  The court denied Petitioner's motion for rehearing on February 5, 2013 (Exs. P, Q).

On October 4, 2013, Petitioner filed another petition for writ of habeas corpus in the First DCA, Case No. 1D13-4943, alleging ineffective assistance of appellate counsel (Ex. R).  The First DCA denied the petition as untimely and successive on November 12, 2013 (Ex. U).  Landrum v. State, 128 So. 3d 167 (Fla. 1st DCA 2013) (Mem).  The court denied Petitioner's motion for rehearing on December 19, 2013 (Ex. V, W).

On November 8, 2013, Petitioner filed another Rule 3.800(a) motion to correct illegal sentence (Ex. X).  The state circuit court summarily denied the motion in an order rendered February 4, 2014 (id.).  Petitioner appealed the decision to the First DCA, Case No. 1D14-1228 (Exs. Z, AA).  The First DCA affirmed per curiam without written opinion on May 27, 2014, with the mandate issuing August 11, 2014.  Landrum v. State, No. 1D14-1228, 2014 WL 2186960 (Fla. 1st DCA May 27, 2014).

Petitioner filed the instant federal habeas action on July 26, 2013 (doc. 1 at 11).

II.     STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States.  As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA).  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218–19.  In relevant part, section 2254(d) now provides:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in <u>Williams v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[2]  The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court.  Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

<u>Id.</u>, 529 U.S. at 412–13 (O'Connor, J., concurring); <u>Ramdass v. Angelone</u>, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000).  In employing this test, the Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision."  <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).  The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case."  <u>Neelley v. Nagle</u>, 138 F.3d 917, 923 (11th Cir. 1998), *overruled on other grounds by* <u>Parker v. Head</u>, 244 F.3d 813, 835 (11th Cir. 2001).

---

[2] Unless otherwise noted, references to <u>Williams</u> are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'"  Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405–06).  The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (quoting Williams, 529 U.S. at 405–06).  If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.  Moreover, where there is no Supreme Court precedent on point, the state court's conclusion cannot be contrary to clearly established federal law.  See Henderson v. Campbell, 353 F.3d 880, 890 n. 15 (11th Cir. 2003).

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases.  The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable."  Williams, 529 U.S. at 409.  Whether a State court's decision was an unreasonable application of a legal principle must be assessed in light of the record the court had before it.  Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 2737–38, 159 L. Ed. 2d 683 (2004) (per curiam); cf. Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 1851 n.4, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).  An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001).  "In determining whether a state court's decision represents an unreasonable application of clearly established federal law, a federal court

conducting habeas review 'may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable.'"  Gill v. Mecusker, 633 F.3d 1272, 1287 (11th Cir. 2011) (quoting Williams, 529 U.S. at 411) (citing Harrington v. Richter, — U.S. —, 131 S. Ct. 770, 786–87, 178 L. Ed. 2d 624 (2011)).  The AEDPA's "unreasonable application" standard focuses on the state court's ultimate conclusion, not the reasoning that led to it.  See Gill, supra at 1291 (citing Harrington, 131 S. Ct. at 786).  Under § 2254(d), a habeas court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court.  See Harrington, 131 S. Ct. at 786; see also Gill, supra, at 1292 (the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding."  Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); see e.g., Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); Jones v. Walker, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s

"unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact."). The "unreasonable determination of the facts" standard is only implicated to the extent that the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. *See* Gill, 633 F.3d at 1292. A petitioner is not entitled to relief unless he demonstrates by clear and convincing evidence that the record reflects an insufficient factual basis for affirming the state court's decision. *Id.*

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See* Panetti v. Quarterman, 531 U.S. 930, 953, 127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007); Jones, 469 F.3d 1216 (same). The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).

Within this framework, the court will review Petitioner's claims.

III.    PETITIONER'S CLAIMS

A.    Ground One: "Trial court erred in denying judgment of acquittal on insufficient evidence to support conviction, where State's key witness was granted immunity from perjury rendering oath pointless, also where the State's key witness was not credible due to prior inconsistent statements violating Petitioner's constitutional rights and contrary to clearly established federal case law."

Petitioner alleges the State's only witness against him was Bashonda Hanberry (doc. 10 at 5–7). He alleges prior to trial, Hanberry told law enforcement officers that neither she nor Petitioner had any involvement in the crimes (*id.*). Petitioner states on the day of trial, the prosecutor told the judge that Hanberry would be testifying and had agreed to testify truthfully (*id.*). The prosecutor informed the court that Hanberry had given prior untruthful statements, but the State agreed to grant her immunity from perjury charges if she testified truthfully at trial (*id.*). Petitioner states Hanberry then testified at trial that she was in a vehicle with Petitioner and her boyfriend, co-Defendant Travis Maderson, on the night of the crimes (*id.*). She testified she fell asleep, and when she awoke, she saw Petitioner and Maderson robbing two people on the street (*id.*). She testified they drove away,

encountered a red car, robbed the girl in the car, drove away, and were later stopped by police (*id.*). Petitioner alleges the State's other evidence against him was his presence in the vehicle approximately forty-five minutes after the second robbery, his fingerprint on a BB gun located in the vehicle, and his possession of a stolen Playstation game after the robbery (*id.*).

Petitioner alleges the defense presented testimony of Brittany McDaniels, who testified that she was Petitioner's girlfriend, and they were together at the Oakcrest liquor store on the night in question (doc. 10 at 6). Petitioner states McDaniels testified that Petitioner left her company at approximately 7:00–7:30 that night (*id.*). Petitioner states Jonathan Yohn testified he saw Petitioner at the Oakcrest liquor store, and Petitioner left the store at approximately 7:30 p.m. (*id.*). Petitioner testified he picked up Hanberry and Maderson at a Burger King at approximately 7:20 p.m. (*id.*). He testified he borrowed the truck he was driving, and when he got in the truck, the BB gun was on the seat and he moved it to the floor (*id.*). Petitioner testified there was a mask in the truck, which he had seen in the truck on prior occasions (*id.*).

Petitioner states defense counsel moved for a judgment of acquittal ("JOA") on the ground that the evidence was insufficient to prove beyond a reasonable doubt that he committed the crimes (doc. 10 at 6). He states the trial court denied the motion (*id.*). Petitioner raised the issue on direct appeal (*id.*).

Petitioner contends Ms. Hanberry's testimony, which was essentially unsworn and lacked any credibility, together with the other evidence, was insufficient to establish guilt beyond a reasonable doubt (doc. 10 at 7). He contends his conviction violates the Constitution, and the state court's adjudication of his constitutional claim violated clearly established federal law (*id.*).

Respondent concedes Petitioner exhausted this claim by presenting it to the state court on direct appeal (doc. 19 at 23). Respondent contends the evidence was sufficient to present the case to the jury; therefore, Petitioner failed to demonstrate a violation of his due process rights (*id.* at 23–27).

1.     Clearly Established Federal Law

As an issue of federal law, Petitioner's claim derives from the Fourteenth Amendment due process requirement that the evidence presented at trial be sufficient to convict. The Due Process Clause of the Fourteenth Amendment requires the state to prove each element of the offense charged

beyond a reasonable doubt.  *See* Jackson v. Virginia, 443 U.S. 307, 315, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979).  Under Jackson, federal courts must look to state law for the substantive elements of the criminal offense, but to federal law for the determination of whether the evidence was sufficient under the Due Process Clause.  *See* Coleman v. Johnson, — U.S. —, 132 S. Ct. 2060, 2064, 182 L. Ed. 2d 978 (2012).  When reviewing a claim of insufficient evidence, the proper inquiry is not whether the reviewing court itself believes that the evidence established guilt beyond a reasonable doubt, but "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319 (citation omitted).  The court should not re-weigh the evidence but view it in the light most favorable to the jury's verdict. *Id.*  Because jurors are free to evaluate the credibility of testimony and the weight of the evidence, the court should assume that all conflicting inferences were resolved against the defendant.  *Id.* at 326.  The reviewing court is bound by a jury's credibility choices so long as the testimony on which the jury relied was not incredible as a matter of law.  *See* United States v. Thompson, 422 F.3d 1285, 1291 (11th Cir. 2005).  "The fact that [a witness] has consistently lied in the past, engaged in various criminal activities, [and] thought that his testimony would benefit [her] . . . does not make [her] testimony incredible." United States v. Cravero, 530 F.2d 666, 670 (5th Cir. 1976).  For testimony to be considered incredible as a matter of law, "it must be unbelievable on its face, *i.e.*, testimony as to facts that [the witness] could not have possibly observed or events that could not have occurred under the laws of nature."  United States v. Rivera, 775 F.2d 1559, 1561 (11th Cir. 1985) (quotation marks omitted) (alteration in original).

The test under Jackson is a limited one, and it does not require that the evidence rule out every hypothesis except that of guilt beyond a reasonable doubt.  Jackson, 443 U.S. at 326; Wilcox v. Ford, 813 F.2d 1140, 1143 (11th Cir. 1987).  "The simple fact that the evidence gives some support to the defendant's theory of innocence does not warrant the grant of habeas relief."  Wilcox, 813 F.2d at 1143.

### 2.  Federal Review of State Court Decision

There are two layers of judicial deference in federal habeas proceedings.  Johnson, 132 S. Ct. at 2062.  First, a reviewing state court on direct appeal may only set aside the jury's verdict for

insufficient evidence if no rational trier of fact could have agreed with the jury. *Id.* Second, a federal habeas court may overturn the state court decision only if it was objectively unreasonable. *Id.* The only question for the reviewing state court under <u>Jackson</u> is "whether the finding was so insupportable as to fall below the threshold of bare rationality." <u>Johnson</u>, 132 S. Ct. at 2065. That determination in turn is entitled to considerable deference under AEDPA. *Id.*

Petitioner raised his federal due process claim on direct appeal of his conviction (Ex. D). The First DCA adjudicated the claim as follows:

> Javares Landrum appeals convictions on two counts of robbery with a deadly weapon and one count of aggravated assault with a BB gun. On this record, the reliability and credibility of Bashonda Hanberry's testimony were proper matters for the jury. <u>Fitzpatrick v. State</u>, 900 So. 2d 495, 508 (Fla. 2005) (stating that witness credibility and weight of the evidence are solely questions for the jury). The State has clearly distinguished the facts in <u>Geibel v. State</u>, 817 So. 2d 1042 (Fla. 2d DCA 2002), and <u>State v. Shearod</u>, 992 So. 2d 900 (Fla. 2d DCA 2008). Although acknowledging that someone committed the crimes, the defense argued the appellant was not present when the crimes occurred. Ms. Hanberry testified live at the trial. The defense rigorously cross-examined her and availed itself of numerous opportunities to question Ms. Hanberry's motives, reliability, and credibility. We AFFIRM the judgments and sentences.

(Ex. F).

Petitioner was charged with two counts of robbery with a deadly weapon and one count of aggravated assault by threat. To prove the crime of robbery with a deadly weapon, the State was required to prove:

1. Petitioner took money or other property from the person or custody of another;

2. Petitioner took the money or property with intent to either permanently or temporarily deprive the person or the owner of the money or other property;

3. Petitioner used force, violence, assault, or putting in fear in the course of the taking (meaning, either prior to, contemporaneous with, or subsequent to the taking of the property); and

4. In the course of committing the robbery, Petitioner carried a deadly weapon.

Fla. Stat. § 812.13.

To prove the crime of aggravated assault by threat, the State was required to prove:

    1.  Petitioner intentionally and unlawfully threatened, either by word or act, to do violence to the victim;

    2.  At the time, Petitioner appeared to have the ability to carry out the threat;

    3.  Petitioner's act created in the mind of the victim a well-founded fear that the violence was about to take place;

    4.  Petitioner made the assault with a deadly weapon, defined as a weapon used or threatened to be used in a way likely to produce death or great bodily harm.

Fla Stat. §§ 784.011, 784.021(1)(a).  Whether a BB gun is a deadly weapon is a question of fact for the jury.  *See* Dale v. State, 703 So. 2d 1045, 1047 (Fla. 1997) (whether a BB or pellet gun is a deadly weapon is a factual question to be answered by the jury); Young v. State, 33 So. 3d 151, 153 (Fla. 4th DCA 2010); Austin v. State, 336 So. 2d 480, 481 (Fla. 3d DCA 1976) (question of whether particular weapon involved in assault is "deadly weapon" capable of supporting conviction for aggravated assault, is factual question to be resolved by jury); Bass v. State, 232 So. 2d 25, 27 (Fla. 1st DCA 1970).

    The State presented the following evidence at trial.  On February 3, 2009, at approximately 7:30–8:00 p.m., William Stone was walking Brianna Butler home (Ex. B at 43–44).  A lime green pickup truck came up behind them and stopped beside them (*id.* at 45).  Stone "looked to see what they wanted" and saw someone holding a gun, which appeared to be a 12 gauge shotgun (*id.* at 45–46).  The person was holding the gun out of the driver's seat window and said, "Freeze, turn around or I'll blow your head off" (*id.*).  Stone testified that another man exited the passenger side of the truck and searched him and took his wallet out of his back right pocket (*id.* at 46).  The same man then searched Brianna, pulled her pants down, and "cussed her out, said the B word" (*id.*).  Stone testified that the man who robbed him was wearing a red and black "joker's hat" (*id.*).  As the truck drove away, Stone saw a portion of the license plate that read "HG" (*id.* at 47).  He identified pictures of the truck, the gun, and the mask (*id.* at 48).  Stone testified that during the robbery, he felt scared and nervous, and he thought he was going to die (*id.* ).  He testified he did not see anyone else in the truck (*id.*).

    Brianna Butler testified she was walking with William Stone when a lime green truck stopped next to them, and the driver put a gun out of the window and said to do as he said or he

would kill them (Ex. B at 55–56).  She testified the passenger exited the truck and patted down Mr. Stone and took his wallet, cigarettes, and lighter (*id.* at 56–57).  The man then searched her, pulled her pants down and searched her shorts, and then turned around and walked away (*id.* at 57).  She testified the driver pulled the gun back in the window and drove off (*id.*).  Ms. Butler testified she could see the barrel of the gun, and the man had a plastic bag over it with his hand on top of the bag (*id.*).  She testified that the man who searched them was wearing a red, white, and black hat with jingle bells on it, and he threw off the hat just prior to searching them (*id.* at 58).  She described the driver as having a goatee, big eyes, and an afro with twists in it (*id.* at 59–60).  Ms. Butler testified she saw a woman in between the driver and passenger side, who appeared to be asleep (*id.* at 60).

Tiffany Traylor testified that on February 3, 2009, between 8:00–8:30 p.m., she was sitting in her red car when a lime green truck pulled up and the driver of the truck asked if she knew where Joe Patti's was (Ex. B at 69–71).  She testified she told him no, and then another man wearing a mask jumped out of the back of the truck holding a gun and told her to give him everything (*id.* at 70–71).  She described the mask as a "joker" mask (*id.* at 71).  She testified the gun had a long barrel, and she thought it was "real" (*id.* at 71, 80).  Ms. Traylor testified she told the man he "wasn't getting anything," and she heard him "cock" the gun, and both men started taking things from her (*id.* at 71, 80–81).  She testified they took her purse, jacket, jersey, cell phone, Playstation game with Grand Theft Auto in it, and a gold case containing gold-plated teeth (*id.* at 71, 75–76).  Ms. Traylor identified pictures of the mask and gun, as well as her cell phone, jacket, purse, jersey, and the box containing the gold teeth (*id.* at 72–73, 80, 159–61).  She testified she saw a female in the truck, but the female did not move (*id.* at 78).

Deputy Christopher Knotts testified that a 911 call reporting the Stone robbery was received at 7:29 p.m. on February 3, 2009 (Ex. C at 224–25).  He testified that the lime green truck was stopped forty-five minutes later (*id.* at 225).

Officer Randall Ard testified that while he was on patrol on February 3, 2009, he was notified to be on the look out ("BOLO") for a lime green truck that had been involved in a robbery earlier that night (Ex. B at 82–83).  He testified that approximately forty-five minutes after the BOLO, he saw a lime green truck, so he made a traffic stop (*id.* at 83–84).  He testified that two black males and a black female were inside the truck (*id.* at 84).  Officer Ard testified he ordered

everyone out of the truck, and observed what appeared to be a shotgun leaning on a seat (*id.* at 84–85).  He testified he also observed a "jester type" hat in the vehicle (*id.* at 86).

The State's next witness was Bashonda Hanberry.  She testified that she understood she was testifying under immunity, meaning she would not be prosecuted for anything she testified to regarding her involvement on February 3, 2009 (Ex. B at 90–91, 99–100).  Ms. Hanberry testified she was dating Travis Maderson at that time, and she was pregnant (*id.* at 91, 93).  She testified she knew Petitioner, and she identified him in court (*id.* at 91).  Ms. Hanberry testified she was with Petitioner and Maderson on February 3, 2009 (*id.* at 92).  She testified the two men picked her up in a lime green truck at 5:30 or 6:00 p.m. (*id.*).  She testified they drove around for a while, and then she and Maderson got into a fight and he hit her (*id.*).  She testified Maderson pulled over on the side of the road, and they got out of the truck and had a "confrontation" (*id.*).  She testified they then went to Petitioner's aunt's house for a while, and she asked Maderson to take her home because she did not want to be around him anymore (*id.* at 93).  Hanberry testified they left Petitioner's aunt's house and went to Lee Street, and she fell asleep in the vehicle because she was working two jobs at the time (*id.*).  She testified that when she awoke, they were near a big church in Brownsville (*id.*).  She testified she awoke because her head had been on Maderson's shoulder, and Maderson jumped out of the vehicle (*id.*).  Hanberry testified Petitioner and Maderson robbed a man and woman who were walking down the street (*id.*).  She testified Petitioner was holding a gun while Maderson patted down the couple (*id.* at 94).  She testified Petitioner was on the driver's side, halfway in the vehicle and halfway out (*id.* at 104).  She testified she was lying down on the seat, because she did not know what was going on, and she did not want to be involved (*id.* at 94).  Hanberry testified they then drove near Joe Patti's, and Petitioner and Maderson approached a girl in a red car (*id.* at 94–95).  She testified only she and Maderson were inside the truck at the time, and she did not know that Petitioner was in the back of the truck (*id.* at 95).  She testified Maderson pulled up next to the girl's car, and Maderson jumped out of the driver's side of the truck while Petitioner jumped from the back of the truck (*id.* at 96).  She testified there was a mask in the truck, and she believed that Maderson wore it first, and then Petitioner wore it during the second robbery (*id.*).  Hanberry testified Petitioner was at the driver's side of the girl's car and pointed the gun at the girl yelling at her to unlock her doors (*id.*).  She testified Maderson went to the passenger side and took items out

of the girl's car (*id.* at 96–97).  She testified she sat in the truck "in shock" (*id.* at 97).  Hanberry testified Petitioner got back in the truck on the driver's side and had an additional cell phone (*id.* at 112).  She testified Petitioner drove them away from the scene, and they proceeded to Dogwood Apartments (*id.* at 97, 112).  She testified they drove into the apartment complex, and a police officer stopped them (*id.* at 98).

Ms. Hanberry admitted she previously testified under oath during a deposition, and made statements that were inconsistent with her trial testimony (Ex. B at 98).  She testified she stated during her deposition that she and Maderson were not present during the robberies, and that to her knowledge, Petitioner was not involved (*id.* at 99).  Hanberry testified that prior to the deposition she received a telephone call from her child's father, who was in jail with Petitioner and Maderson (*id.*).  She stated her child's father told her that Petitioner was telling people that if she showed up in court, something would happen to her and her daughter (*id.*).

Wayne Wright, a crime scene technician with the Escambia County Sheriff's Office, testified he was called to the location where the officers stopped the truck, and he arrived at 8:38 p.m. (Ex. B at 119–20).  He testified he took photographs of the truck and items found in and around it, including a mask, BB gun, cell phone, box, jacket, and jersey (*id.* at 121–30).  He identified the BB gun as the gun he photographed and collected from the scene, and the gun was admitted into evidence (*id.* at 130).  Wright testified he processed the BB gun for fingerprints (*id.*).  He testified he made four fingerprint lifts from the gun and submitted them to the crime lab for examination (*id.* at 130–31).  On cross-examination, Mr. Wright testified that the gun was a BB gun which was incapable of shooting a bullet (Ex. B at 138).  He described and demonstrated to the jury how the gun operated, but without actually firing it (*id.*).  He testified he had not previously attempted to fire the BB gun, and did not know whether it was functional (*id.* at 137–38).  He also testified he did not know the force with which the gun would propel a BB (*id.* at 139).

Marybeth Bryie testified she was a fingerprint examiner with the Escambia County Sheriff's Office (Ex. B at 141).  She testified that of the four fingerprint lifts submitted to her from Wayne Wright, there was one latent fingerprint of value (*id.* at 145).  She testified she compared the fingerprint to Petitioner's and identified it as Petitioner's right middle finger (*id.* at 146–47).

Officer Courtney Clanton testified she transported Petitioner to the Escambia County Jail after he was arrested (Ex. B at 153).  She testified that Petitioner was searched as part of the booking process, and a Playstation handheld game was removed from his pocket (*id.* at 154).

The State recalled Ms. Traylor, and she identified the Playstation game as hers (Ex. B at 160–61).  The State then rested its case.

The defense called Brittany McDaniels as its first witness (Ex. B at 180).  She testified she was dating Petitioner on February 3, 2009 (*id.*).  She testified she saw Petitioner around 6:00 p.m. at Oakcrest Liquors (*id.* at 181).   She testified Petitioner left Oakcrest Liquors on foot at approximately 7:00 p.m., and she left after that, but before 8:00 p.m. (*id.* at 182).   On cross-examination, she admitted that when she learned Petitioner had been arrested for robbery that night, she did not call the police and report that they had arrested the wrong man (*id.* at 190).

Jonathan Yohn testified he arrived at the Oakcrest Lounge and Package Store at 6:00–6:15 p.m. on February 3, 2009, and Petitioner was already there (Ex. C at 195–96).  He testified he left the lounge at 7:30 p.m., and Petitioner was still there (*id.* at 196–97).  On cross-examination, he testified he did not see Brittany McDaniels with Petitioner at the lounge that night (*id.* at 202).

Petitioner testified he had previously been convicted of five felonies (Ex. C at 212).  He testified he was released from prison in February of 2008, and met Travis Maderson and Bashonda Hanberry shortly thereafter (*id.* at 211–12).  Petitioner testified that on February 3, 2009, he was at Oakcrest Lounge when Maderson called him from Burger King and said he and Hanberry needed a ride (*id.* at 212).  Petitioner candidly admitted he was selling drugs at that time, and he "rented" a lime green truck from Steve Foggy (*id.* at 213).  Petitioner testified Foggy brought the truck to the lounge, and at approximately 7:20 p.m., he drove it to the Burger King and picked up Maderson and Hanberry (*id.* at 212–14).  Petitioner testified he saw the BB gun on the seat when he got into the truck, and he moved it to the floor (*id.* at 214).  He testified he drove to Dogwood Apartments and was stopped by police within ten minutes (*id.* at 215–16).  Petitioner testified he had seen the mask in the truck before that night (*id.* at 218).  He denied that he or Maderson robbed anyone that night (*id.* at 220–21).  He testified that a purse, jersey, and jacket were in the truck when he got in it that night (*id.* at 221).  Petitioner denied that he had a Playstation in his pocket when he was arrested (*id.* at 221–22).

"[A] state court's interpretation of state law . . . binds a federal court sitting in habeas corpus." Bradshaw v. Richey, 546 U.S. 74, 76, 126 S. Ct. 602, 163 L. Ed. 2d 407 (2005); *see also* Mullaney v. Wilbur, 421 U.S. 684, 691, 95 S. Ct. 1881, 44 L. Ed. 2d 508 (1975) ("State courts are the ultimate expositors of state law," and federal courts must therefore abide by their rulings on matters of state law) (citations and footnote omitted); Carrizales v. Wainwright, 699 F.2d 1053, 1055 (11th Cir. 1983).   Therefore, this court must defer to the First DCA's determination that the reliability and credibility of Bashonda Hanberry's testimony were proper matters for the jury. Considering this determination, and viewing the trial evidence in the light most favorable to the prosecution, the First DCA's rejection of Petitioner's due process claim was not contrary to or an unreasonable application of Jackson.  The evidence was indeed sufficient to enable a rational juror to find beyond a reasonable doubt that Petitioner committed two robberies with a deadly weapon and one aggravated assault on February 3, 2009.  Therefore, Petitioner is not entitled to federal habeas relief on Ground One.

      B.      Ground Two:  "Ineffective assistance of appellate counsel; insufficient evidence to find "BB gun" a deadly weapon.  Appellate counsel's failure to raise reversible error violates Petitioner's constitutional rights and contrary [sic] to clearly established federal case law."

Petitioner contends appellate counsel was ineffective for failing to argue on appeal that the trial court erred by denying the motion for JOA based upon the lack of sufficient evidence that the BB gun was a deadly weapon (doc. 10 at 7–10; doc. 24).  Petitioner argues that the admission into evidence of photographs of the BB gun and a box containing the BB gun was not sufficient to "present" the BB gun to the jury for a determination as to whether it was functional, operable, or capable of being used as a deadly weapon, because the jury could not view, inspect, or handle the BB gun (doc. 10 at 8–9; doc. 24 at 4 n.1).  Petitioner contends the jury was presented with no evidence that the BB gun was operable, deadly, or could have been used in a deadly manner (doc. 10 at 9–10).  Petitioner alleges trial counsel preserved this issue for appeal by arguing it in her motion for JOA (*id.* at 9).

Respondent concedes Petitioner exhausted this claim by presenting it in his state habeas petition (doc. 19 at 28).  Respondent contends the state court's adjudication of the claim was not contrary to or an unreasonable application of clearly established federal law (*id.* at 28–31).

      1.      Clearly Established Federal Law

Claims of ineffective assistance of counsel, including those challenging the actions of appellate counsel, are governed by the standard laid out in <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  <i>See</i> <u>Philmore v. McNeil</u>, 575 F.3d 1251, 1264 (11th Cir. 2009) ("Claims of ineffective assistance of appellate counsel are governed by the same standards applied to trial counsel under <u>Strickland</u>.").  Under that standard, a defendant must establish (1) that his counsel's performance was deficient, and (2) that the deficient performance was prejudicial.  <u>Strickland</u>, 466 U.S. at 687.

Counsel's performance is deficient only if it falls below the wide range of competence demanded of attorneys in criminal cases.  <i>Id.</i> at 688; <u>Chandler v. United States</u>, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc) (a petitioner must "establish that no competent counsel would have taken the action that his counsel did take.").  Thus, to show that his appellate counsel failed to provide the level of representation required by <u>Strickland</u>, a petitioner must show more than the mere fact that appellate counsel failed to raise a potentially meritorious claim; he must show that no competent counsel, in the exercise of reasonable professional judgment, would have omitted that claim.  <i>See</i> <u>Hittson v. GDCP Warden</u>, — F.3d ___, 2014 WL 3513033, at *44 (11th Cir. July 9, 2014) (applying <u>Chandler </u>to claim of ineffective assistance of post-conviction counsel).  A fair assessment of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  <u>Strickland</u>, 466 U.S. at 689.  In assessing an appellate attorney's performance, the court is "mindful that the Sixth Amendment does not require appellate advocates to raise every non-frivolous issue.  Rather, an effective attorney will weed out weaker arguments, even though they may have merit."  <u>Philmore</u>, 575 F.3d at 1264 (internal quotation marks omitted).  Appellate counsel's performance will be deemed prejudicial only if "the neglected claim would have a reasonable probability of success on appeal."  <i>Id.</i> at 1265 (internal quotation marks omitted).

2.      Federal Review of State Court Decision

Petitioner raised his claim of ineffective assistance of appellate counsel in a state habeas petition (Ex. N).  The First DCA summarily rejected Petitioner's claim on the merits (Ex. O).  The First DCA's decision is due deference under 28 U.S.C. § 2254(d).  <i>See</i> <u>Richter</u>, 131 S.Ct. at 784–85;

Cullen v. Pinholster, ⸻ U.S. ⸻, 131 S. Ct. 1388, 1402, 179 L. Ed. 2d 557 (2011).  Under § 2254(d)(1), the question is whether the state court decision is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  Because the First DCA's decision was summary in nature, petitioner "can satisfy the 'unreasonable application' prong of § 2254(d)(1) only by showing that 'there was no reasonable basis' for [its] decision."  Cullen, 131 S. Ct. at 1402 (quoting Richter, 131 S. Ct. at 786).  The duty of a federal habeas court in these circumstances is clear and was clearly restated by the Supreme Court in Cullen:  "[A] habeas court must determine what arguments or theories . . . could have supporte[d] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court."  Cullen, 131 S. Ct. at 1402 (quoting Richter, 131 S.Ct. at 786).  Petitioner fails to meet that high threshold.  Because the federal court's evaluation of counsel's performance under Strickland is deferential, as is the court's review of claims adjudicated on the merits by the state courts, the result is "double deference," which is extremely difficult for a petitioner to overcome.  Evans v. Sec'y, Fla. Dep't of Corr., 699 F.3d 1249, 1268 (11th Cir. 2012).  "[I]t will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding."  Id.  The instant case is not one of those rare cases.

As previously discussed, the issue of whether the non-firearm weapon used by the defendant was a deadly weapon is a question of fact to be resolved by the trier of fact based upon the evidence.  See Dale, 703 So. 2d at 1047; Young, 33 So. 3d at 153; Austin, 336 So. 2d at 481; Bass, 232 So. 2d at 25.  A "deadly weapon" is any instrument which, when used in the ordinary manner contemplated by its design and construction will or is likely to cause death or great bodily harm, or any instrument likely to cause great bodily harm because of the way it is used during a crime.  See D.B.B. v. State, 997 So. 2d 484, 485 (Fla. 2d DCA 2008); J.M. v. State, 872 So. 2d 985, 986 (Fla. 1st DCA 2004); Cloninger v. State, 846 So. 2d 1192, 1193 (Fla. 4th DCA 2003).  A jury's finding must be based upon evidence, or reasonable inferences therefrom, of likelihood to produce death or great bodily injury, and the jury may consider the character of the assault and the way the weapon is used.  See M.R.R. v. State, 411 So. 2d 983, 984 (Fla. 3d DCA 1982) (for purposes of aggravated assault statute,

if the instrument is not a firearm, then courts are to apply an objective test and look to the nature and actual use of the instrument); Austin, 336 So. 2d 480.  The jury may consider the instrument's size, shape, material, and the manner in which it was used or was capable of being used.  *See* D.B.B., 997 So. 2d at 485; Dixon v. State, 603 So. 2d 570, 574 (Fla. 5th DCA 1992).  A jury may conclude that a BB gun is either a dangerous or a deadly weapon where the defendant's words or actions imply that the gun is dangerous or deadly, regardless of whether the BB gun is loaded and operable.  *See* Santiago v. State, 900 So. 2d 710, 712 (Fla. 3d DCA 2005); Mitchell v. State, 698 So. 2d 555, 558 (Fla. 2d DCA 1997), *approved* 703 So. 2d 1062 (Fla. 1997).[3]

In the instant case, the jury heard William Stone's testimony that when the lime green truck stopped beside him and Brianna Butler, he saw the driver (who Bashonda Hanberry and Brianna Butler identified as Petitioner) holding what appeared to be a 12-gauge shotgun out of the driver's seat window, and heard him say, "Freeze, turn around or I'll blow your head off."  Brianna Butler also testified that Petitioner held a gun out of the truck's window and said to do as he said or he would kill them.  Tiffany Traylor testified that the robber who jumped out of the back of the truck (who Bashonda Hanberry identified as Petitioner) was holding a gun with a long barrel and demanded that she give him everything.  She testified she told Petitioner he "wasn't getting anything," and he cocked the gun.  The jury also heard Wayne Wright's testimony regarding how the BB gun operated, and he showed the jury how it worked.  Further, the BB gun was admitted into evidence (Ex. B at 131); thus the jury was able to consider its size, shape, and material.  There was no evidence suggesting that the BB gun was inoperable.[4]

Petitioner cites M.J. v. State, 100 So. 3d 1286 (Fla. 4th DCA 2012), Jones v. State, 869 So. 2d 1240 (Fla. 4th DCA 2004), and K.C. v. State, 49 So. 3d 841 (Fla. 4th DCA 2010) in support of his argument that there is a reasonable probability he would have succeeded on direct appeal if

---

[3] In approving the decision below, the Florida Supreme Court noted that the district court had certified the following question: "If the State fails to prove that a BB pistol is loaded and operable at the time of an offense, can it be classified as a dangerous or deadly weapon when the defendant's actions cause the victim to reasonably believe that the BB pistol is loaded and operable?"  Mitchell, 703 So. 2d at 1062.  The court noted it had recently addressed this question in Dale, 703 So. 2d at 1045, and reiterated that the issue of "whether a BB gun—loaded or unloaded—is a deadly weapon is a jury question."  *Id.*

[4] As previously noted, Wayne Wright testified that he did not attempt to fire the gun, and he did not know whether it was operable.

appellate counsel had argued the BB gun issue (*see* doc. 24).  In M.J., the Fourth DCA reversed a conviction for "exhibiting a firearm or other deadly weapon in a rude, careless, angry or threatening manner," because the BB gun fired by the defendant was not offered into evidence, and no witness testified about how the BB gun might qualify as a "deadly weapon."[5]  100 So. 3d at 1287.

In Jones, the Fourth DCA reversed a conviction for robbery with a deadly weapon even though the defendant held a BB gun to the victim's face and ordered her to drop her purse, because there was no evidence that the gun was loaded at the time of the crime's commission, the gun was not introduced into evidence, the State presented no evidence concerning the injury that could be inflicted by such a weapon, and the defendant testified the gun was a cheap model that "couldn't hurt a fly."  869 So. 2d at 1241–42.

In K.C., the Fourth DCA reversed a conviction for possession of a weapon on school property, because even though the BB gun was admitted into evidence, there was no testimony describing its operation, the manner in which it was used or threatened to be used, or the nature and character of injuries it was capable of inflicting.  49 So. 3d at 842–43.

The evidence in the instant case falls more in line with cases where Florida courts have considered evidence sufficient to survive a motion for JOA on the issue of whether a BB gun qualified as a deadly weapon.  *See, e.g.*, Dale, 703 So. 2d at 1047 (even though no evidence was presented that the BB gun was loaded at time of offense, evidence that the defendant carried the BB gun and stated "I have a gun" during the commission of robbery, that the jury had an opportunity to view the weapon first-hand, and that an officer showed the jury in detail how the gun operated, supported a jury finding that the BB gun was a deadly weapon); J.T. v. State, 47 So. 3d 934, 936 (Fla. 4th DCA 2010) (where the State introduces the BB gun into evidence and offers testimony regarding how it works and the extent of harm which can be caused by a BB gun, the State has presented legally sufficient evidence to avoid a judgment of dismissal, and it is then a question for the trier of fact to determine by competent substantial evidence as to whether the BB gun constitutes a deadly weapon); Santiago, 900 So. 2d at 712 (evidence was sufficient to show the BB gun used during the burglary was a dangerous weapon, so as to support the conviction for armed burglary with

---

[5] M.J. was decided after Petitioner's direct appeal.

a dangerous weapon, even though there was no evidence the gun was loaded or operable; the gun itself was introduced and the jury had an opportunity to examine it to determine if it was capable of causing great bodily harm or serious injury; no evidence established or even suggested the gun was inoperable; and the defendant's actions and words implied the gun was dangerous, in that he pointed the gun directly at the victim, who was only ten feet away, and told her the gun was loaded and that he would use it); Mitchell, 698 So. 2d at 563 (evidence that the defendant used a BB pistol during the offenses, that with both words and actions he implied the gun was loaded and operable, and that nothing visible to any victim would lead any rational person to conclude that the BB gun, which looked like a .22 caliber semi-automatic pistol, was not a loaded and operable deadly or dangerous weapon, was sufficient to support convictions for trespass with a dangerous weapon, robbery with a deadly weapon, and aggravated assault with a deadly weapon, even if the BB gun was not loaded).

In light of this case law, it was not unreasonable for the First DCA to reject Petitioner's claim. Petitioner failed to show that no competent counsel would have winnowed out the BB gun claim. He also failed to show that appellate counsel's doing so was prejudicial in the Strickland sense. Therefore, Petitioner is not entitled to federal habeas relief on Ground Two.

C.    Ground Three:  "Ineffective assistance of counsel for failing to call as a defense witness Steven Fogie,[6] violating Petitioner's constitutional rights and contrary to clearly established federal case law."

Petitioner contends defense counsel was ineffective for failing to call Steven Fogie, the owner of the lime green truck, as a witness (doc. 10 at 10–11). Petitioner alleges Mr. Fogie was available to testify and would have testified that he loaned his truck to many people, including Petitioner, in exchange for drugs (id.). He alleges Mr. Fogie would have additionally testified that the BB gun and mask did not belong to Petitioner and were in the truck when he loaned it to Petitioner (id.). Petitioner contends the outcome of his trial would have been different if the jury had heard Fogie's testimony (id. at 11).

Respondent concedes Petitioner exhausted this claim by presenting it in his Rule 3.850 motion (doc. 19 at 32). Respondent contends the state court's adjudication of the claim was not contrary to or an unreasonable application of clearly established federal law (id. at 32–36).

_____
[6] Mr. Fogie's name is spelled "Foggy" in the trial transcript.

       1.      Clearly Established Federal Law

As previously discussed, the standard for evaluating claims of ineffective assistance of counsel is set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  To obtain relief under <u>Strickland</u>, Petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.  *Id.* at 687–88.  If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief.  *Id.* at 697.

"The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one." <u>Jones v. Campbell</u>, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing <u>Chandler</u>, 218 F.3d at 1313).  The focus of inquiry under the performance prong is "reasonableness under prevailing professional norms." <u>Strickland</u>, 466 U.S. at 688–89.  "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. Furthermore, "[e]ven if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." <u>Rogers v. Zant</u>, 13 F.3d 384, 386 (11th Cir. 1994).  Counsel's performance is deficient only if it is "outside the wide range of professional competence." <u>Jones</u>, 436 F.3d at 1293 (citing <u>Strickland</u>, 466 U.S. at 690); <u>Lancaster v. Newsome</u>, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation").  "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ." <u>Michael v. Crosby</u>, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting <u>Chandler</u>, 218 F.3d at 1317). Indeed, "'[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict the wide latitude counsel have in making tactical decisions.'" *Id.* (quoting <u>Putman v. Head</u>, 268 F.3d 1223, 1244 (11th Cir. 2001)).

As to the prejudice prong of the <u>Strickland</u> standard, Petitioner's burden of demonstrating prejudice is high.  *See* <u>Wellington v. Moore</u>, 314 F.3d 1256, 1260 (11th Cir. 2002).  The Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'"  *Id.* (quoting <u>Strickland</u>, 466 U.S. at 693).

However, the Court has also clarified that a petitioner need not demonstrate it "more likely than not, or prove by a preponderance of evidence," that counsel's errors affected the outcome.  Strickland, 466 U.S. at 693–94.  Instead,

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.

Id. at 694.  Indeed, it would be "contrary to" the law clearly established in Strickland for a state court to reject an ineffectiveness claim for failing to prove prejudice by a preponderance of the evidence.  Williams v. Taylor, 529 U.S. at 405–06.

The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law.  Strickland, 466 U.S. at 694–95.  "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  Id. at 695.

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact.  Strickland, 466 U.S. at 698; Collier v. Turpin, 177 F.3d 1184, 1197 (11th Cir. 1999).

2.      Federal Review of State Court Decision

Petitioner presented this issue as Claim 1 in his Rule 3.850 motion (Ex. J at 86–87).  The state circuit court correctly stated the deficient performance and prejudice prongs of the Strickland standard as the applicable legal standard (id. at 178–79).  The court adjudicated the claim as follows:

> In his first claim, Defendant alleges that counsel should have called Steven Fogie as a witness for the defense.  Defendant claims that Mr. Fogie would have testified 1) "to the time he let [D]efendant rent his truck out for drugs"; 2) to the "contents inside the truck as in the mask [and] the BB gun," which were in the truck when Defendant received the truck; 3) to the fact that "Defendant usually sends different people in his truck to return it and upon doing so Mr. Fogie drops them off": and 4) to the fact that Defendant did not own the BB gun used in the robberies.
>
> First, with regard to the "time" Mr. Fogie allowed Defendant to rent the truck, this allegation is not facially sufficient.  Defendant does not explain what

testimony Mr. Fogie would have given regarding the "time," nor does he explain how Mr. Fogie's "time" testimony would have been different from the testimony of other witnesses. As noted above, this Court has previously given Defendant opportunity to remedy his pleading deficiencies, but he has failed to do so with regard to this portion of the instant claim. Therefore, this portion of Defendant's first claim cannot entitle him to relief.

Second, with regard to Mr. Fogie's potential testimony that the mask and BB gun were already in the truck when Defendant rented it and that the BB gun did not belong to Defendant, Defendant has not shown how he was prejudiced by the lack of such testimony. Defendant does not contend that Mr. Fogie would have testified that Defendant did not have access to the listed items. Therefore, the mere fact that the items belonged to someone other than Defendant does not necessarily mean that Defendant did not use them to perpetrate the charged crimes.

Last, with regard to Mr. Fogie's potential testimony that "Defendant usually sends different people in his truck to return it and upon doing so Mr. Fogie drops them off," Defendant does not make clear how Mr. Fogie's testifying simply to the fact that others sometimes used his truck would have aided Defendant's case. Therefore, this Court finds that Defendant has failed to show either that his counsel was deficient for failing to call this witness to testify or that Defendant was prejudiced by counsel's inaction. This allegation cannot entitle Defendant to relief.

(Ex. J at 179–80). The First DCA affirmed the circuit court's decision (Ex. K).

Counsel's decision whether to call a particular witness is a matter of trial strategy entitled to great deference. Chandler, 218 F.3d at 1314 n.14 (citing Waters v. Thomas, 46 F.3d 1506, 1512, 1518–19 (11th Cir. 1995) (en banc)). If the record is not complete regarding counsel's actions, then the courts should presume "that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some reasonable lawyer might do." Chandler, 218 F.3d at 1314–15 n.15. "The mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel." Waters, 46 F.3d at 1514. "Complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative." Buckelew v. United States, 575 F.2d 515, 521 (5th Cir. 1978).

Initially, Petitioner did not submit an affidavit from Mr. Fogie stating he was available to testify or setting forth the substance of his proposed testimony; therefore, Petitioner's allegations

as to the content of Mr. Fogie's testimony are purely speculative.[7]  Further, assuming arguendo that Mr. Fogie would have testified as Petitioner alleges, the testimony would not have been particularly helpful to the defense, for the reasons articulated by the state court.  In fact, Mr. Fogie's testimony that he loaned Petitioner the truck at 3:30 on the afternoon of February 3, 2009, would have contradicted Petitioner's testimony that he did not receive the truck from Mr. Fogie until 7:20 p.m. Therefore, Petitioner failed to show that defense counsel's failure to call Mr. Fogie was unreasonable, and Petitioner also failed to satisfy his burden of showing a reasonable probability the outcome of his trial would have been different had counsel presented Mr. Fogie's testimony. Accordingly, Petitioner is not entitled to habeas relief on Ground Three.

> D.   Ground Four:  "Ineffective assistance of counsel for failing to secure a weapons expert to demonstrate to the jury that the BB gun was not operable and therefore not a deadly weapon, violating Petitioner's constitutional rights and contrary to clearly established federal case law."

Petitioner contends defense counsel was ineffective for failing to present expert testimony that the BB gun was not operational (doc. 10 at 11–12).  He contends if counsel had presented this expert testimony, the jury would not have convicted him of robbery with a deadly weapon (*id.*).

Respondent concedes Petitioner exhausted this claim by presenting it in his Rule 3.850 motion (doc. 19 at 36).  Respondent contends the state court's adjudication of the claim was not contrary to or an unreasonable application of clearly established federal law (*id.* at 36–40).

1.   Clearly Established Federal Law

The Strickland standard, discussed *supra*, governs this claim.

2.   Federal Review of State Court Decision

Petitioner presented this issue in Claim 11 of his Rule 3.850 motion (Ex. J at 108–09).  The state circuit court adjudicated the claim as follows:

---

[7] Petitioner attached to his Rule 3.850 motion a summary of witness interviews, including a summary of an interview with Mr. Fogie (Ex. J at 115).  It is unclear who conducted the interviews, and there is no indication the witnesses were sworn prior to being interviewed.  The summary of Mr. Fogie's interview states, in relevant part:

> Steven stated on the day in question he did loan his truck to Javares to move his girlfriend.  He stated he gave the truck to Javares at approximately 3:30 p.m., on the day in question.  Steven stated he did not loan the truck to anyone else on February 3, 2009.

(Ex. J at 115).

In his final allegation, Defendant claims that his counsel was ineffective for failing to ensure that the testimony of a firearms expert was presented to the jury regarding the operability of the BB gun. Defendant states that counsel either should have objected to the fact that the State did not adduce such evidence or should have presented a firearms expert for the defense.  Defendant alleges that an expert would have testified that the BB gun in question was inoperable.  Defendant alleges that such testimony would have allowed the jury to make a "better judgment" and to determine that the BB gun could not have been considered a deadly weapon.

First, the fact that the State did not offer testimony regarding the operation of the BB gun was not overlooked by counsel.  Although counsel did not object, she did challenge the legal sufficiency of the State's proof by making a motion for judgment of acquittal.  Counsel argued that the State's failure to prove that the BB gun was operable or capable of inflicting deadly harm should defeat any finding that the BB gun was a "deadly weapon."  The Court took the motion under advisement and eventually denied the motion for judgment of acquittal.  Therefore, counsel was not ineffective for failing to object to the State's lack of evidence regarding the operation of the BB gun.

Also, counsel brought out at trial that there was no indication that the BB gun was operable at the time of the crimes.  Counsel asked the crime scene technician who processed the scene whether he had "attempt [ed] to fire or use the BB gun." The technician admitted that he had not done so. Counsel continued by asking him "whether or not the BB gun even works."  The technician admitted that he did not know.  Counsel also made it a point to have the technician inform the jury that "a bullet wouldn't work from this gun" and that he did not know with "what force it would propel a BB."  Therefore, counsel brought to the jury's attention the fact that this gun had not been shown to have been capable of being deadly.  Defendant has not shown a reasonable probability that testimony that the BB gun did not work, as opposed to testimony that no one knew whether it worked, would have caused the jury to return a different verdict.

Even had counsel called a firearms expert to testify, Defendant has not shown that the jury's verdict would have been different.  The jury was instructed that '[a] weapon is a 'deadly weapon' if it is used or threatened to be used in a way likely to produce death or great bodily harm."  See Mitchell v. State, 698 So. 2d 555, 560 (Fla. 2nd DCA 1997).  See also Whitted v. State, 992 So. 2d 352 (Fla. 4th DCA 2008).

Two of the victims testified that when the weapon in this case was pointed at them, they believed they were in danger.  Two victims testified that the perpetrator threatened to kill them, one of whom testified that the perpetrator threatened to "blow [the victim's] head off." The third victim testified that the perpetrator "cocked

the gun" when she initially refused to give him her belongings.  Therefore, the undisputed evidence at trial was that the BB gun had been "threatened to be used in a way likely to produce death or great bodily harm."  Testimony that the BB gun could not actually have caused death or great bodily harm would not have negated the fact that the victims believed at the time of the robberies that it could have been so used.  The Court does not find that Defendant has shown a substantial likelihood that such testimony would have persuaded the jury to convict Defendant of robbery with a weapon instead of robbery with a deadly weapon.  Therefore, this allegation cannot entitle Defendant to relief.

(Ex. J at 189–91) (footnotes omitted).  The First DCA affirmed the circuit court's decision (Ex. K).

Petitioner did not submit any evidence, in the form of an affidavit or otherwise, from an expert stating he or she would have testified that the BB gun was inoperable.  Therefore, Petitioner's allegation that an expert would have so testified is purely speculative.

Additionally, even if an expert would have testified that the BB gun was inoperable, Petitioner failed to demonstrate a reasonable probability the result of trial would have been different. Defense counsel emphasized during her cross-examination of Wayne Wright and in closing argument that there was no evidence the BB gun was operational.  In closing, counsel argued:

Ms. Traylor said she heard a gun cock even though she couldn't see it, and you will be able to take the gun back with you.  This gun doesn't cock.  This is the closest thing to anything and it's going to be your determination whether or not this is a deadly weapon.  There was no testimony that this BB gun is operational in any way and you see that the barrel is kind of loose, you can move it pretty easily.  I have fired a BB gun before.  You can see that there's something clearly broken off right here from the gun.  This does not appear to be doing anything as I move it.  The BB gun would normally be pumping air in.  Nothing is happening there.  I understand that on that night these three individuals believed this to be potentially a firearm or a deadly weapon, but you get to make the determination of whether or not it was. You will have the opportunity to inspect it much more closely than they did.  No testimony whatsoever from law enforcement that anyone ever tried to test fire this to see if it works.

(Ex. C at 251–52).  The jury was fully aware there was no evidence the gun was operational, yet they concluded the BB gun qualified as a deadly weapon based upon their consideration of the gun itself, and the testimony that Petitioner pointed the BB gun at all of the victims, the victims believed it was a real gun, Petitioner threatened Mr. Stone and Ms. Butler with death, Mr. Stone believed he

was going to die, and Ms. Traylor heard Petitioner "cock" the gun in response to her verbal resistance to the robbery.

Petitioner failed to demonstrate that the state court's adjudication of his claim concerning counsel's failure to call a weapons expert was contrary to or an unreasonable application of Strickland.  Therefore, he is not entitled to federal habeas relief on Ground Four.

E.    Ground Five:  "Ineffective counsel for failing to file motion to suppress illegal suggestive identification violating Petitioner's constitutional rights and contrary to clearly established federal case law."

Petitioner contends defense counsel was ineffective for failing to seek suppression of a victim's in-court identification of him as one of the men who assaulted her (doc. 10 at 12–13).  As grounds for suppression, Petitioner alleges the victim gave inconsistent descriptions of the robber at the scene, in her deposition, and in her trial testimony (id.).  He alleges no pre-trial identifications were made, and a long period of time elapsed between the crime and trial (id.).  Petitioner alleges he was the only black man in the courtroom, and he was sitting at the defense table (id.).  He contends these circumstances show there was a strong probability of misidentification, and defense counsel should have sought suppression of the victim's identification testimony on this ground (id.).

Respondent concedes Petitioner exhausted this claim by presenting it in his Rule 3.850 motion (doc. 19 at 41).  Respondent contends the state court's adjudication of the claim was not contrary to or an unreasonable application of clearly established federal law (id. at 41–44).

1.    Clearly Established Federal Law

The Strickland standard, discussed supra, governs this claim.

2.    Federal Review of State Court Decision

Petitioner presented this issue in Claim 3 of his Rule 3.850 motion (Ex. J at 90–91).  The state circuit court adjudicated the claim as follows:

Defendant next alleges that counsel should have "objected or filed the proper motion to have the victim's testimony of Defendant at trial about Defendant's description disposed of."  Defendant alleges that the victim was accidentally shown a picture of Defendant while she was in the State Attorney's Office.  Defendant points out that the victim's description of the perpetrator was different at trial than it was at her deposition because the victim was conforming her description to fit the picture she had seen of Defendant.

The record reflects that Defendant's recitation of the facts is not entirely correct.  While the minor victim did state in her deposition that she had "seen it on the computer and the state attorney accidentally said his name," she was referring to the source of her information regarding the name "Travis," the name of the co-defendant in the instant case.  The minor victim never stated in her deposition that she had seen a picture of either Travis or Defendant.  The victim did indicate at trial that at some point after her deposition she had seen a picture of Defendant and that her description of him at trial matched the picture.

Defendant has not shown counsel to have been deficient.  Defendant has not shown that counsel knew before trial that the victim's description of the perpetrator had changed from that given in her deposition.  Hence, Defendant has not shown that counsel could have moved, prior to trial, to have the victim's testimony concerning the perpetrator's description suppressed or even would have had reason to believe that such a motion was necessary.

While Defendant has not shown that an objection would have been appropriate when the victim gave a different description of the perpetrator at trial, the Court finds that counsel handled the issue appropriately.  Counsel cross-examined the witness in some detail regarding the variance in her descriptions of the driver.  Counsel brought out that, at deposition, the victim had denied that the driver had facial hair, had failed to mention any "twists" in the afro, and had said the driver was dark skinned instead of medium skinned as she stated at trial.  Counsel also asked the victim if she had seen a picture of Defendant and if her description at trial had been influenced by the photograph.

Also, during closing argument, counsel argued that the victim's description of the perpetrator had been based upon her seeing a picture of Defendant.  She reminded the jury that the victim had testified to something different at her deposition before she had seen the picture.  In light of these considerations, the Court does not find that the variance in the description prejudiced Defendant or that counsel was deficient in her handling thereof.  This allegation cannot entitle Defendant to relief.

(Ex. J at 181–82) (footnotes omitted).  The First DCA affirmed the circuit court's decision (Ex. K).

In-court identification testimony may not be admitted when the police have obtained a pre-trial lineup identification in violation of defendant's right to counsel, or when police have obtained a pre-trial identification by means of an unnecessarily suggestive procedure, unless the in-court identification is found to be reliable and based solely upon the witness' independent recollection of the offender at the time of crime, uninfluenced by the intervening illegal confrontation.  *See* <u>Edwards</u>

v. State, 538 So. 2d 440, 442 (Fla. 1989) (citing United States v. Wade, 388 U.S. 218, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967); Gilbert v. California, 388 U.S. 263, 87 S. Ct. 1951, 18 L. Ed. 2d 1178 (1967); Manson v. Brathwaite, 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977); Neil v. Biggers, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972); Simmons v. United States, 390 U.S. 377, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968); and Stovall v. Denno, 388 U.S. 293, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967)).  One Florida court has held that an officer's conduct of providing victims with the defendant's name, which the victims used to locate and view the defendant's photo on the county sheriff's website before they had an opportunity to identify him, is unnecessarily suggestive, creating a substantial likelihood of irreparable misidentification and requiring exclusion of a pre-trial photo identification and an in-court identification of the defendant at trial.  *See* State v. Gomez, 937 So. 2d 828, 833 (Fla. 4th DCA 2006).

The instant case did not involve a pre-trial identification.  The transcript of Brianna Butler's deposition taken November 18, 2009, confirms, that Ms. Butler learned the name of Petitioner's co-defendant, Travis, because the state attorney accidentally said it (Ex. J at 216, 224–25).  Ms. Butler stated in her deposition that she saw the names Travis and Javares in March of 2009, when she looked at the clerk of court's online docket of the criminal case (*id.* at 225).  At trial on December 14 and 17, 2009, defense counsel rigorously cross-examined Ms. Butler regarding inconsistencies in her description of the robber at trial, compared to the description she gave during her deposition (Ex. B at 61–68).  Counsel also elicited Ms. Butler's admission that after her deposition on November 18, she found a picture of Petitioner on the computer (*id.* at 65, 68).  Ms. Butler admitted that the description of the robber she provided in court matched the person in the picture, and she admitted that her in-court description did not match the description she provided in her deposition the previous month (*id.* at 66).  Defense counsel argued to the jury that the inconsistencies in Ms. Butler's descriptions rendered her in-court identification unreliable (*see* Ex. B at 61–68, Ex. C at 249–51).

Although defense counsel may have had a basis to exclude Ms. Butler's identification testimony under Gomez, 937 So. 2d at 833, counsel's decision to impeach Ms. Butler's testimony instead and argue its unreliability was not a decision that no competent counsel would have made. Additionally, Ms. Butler's testimony was not the only evidence linking Petitioner to the robberies.

Bashonda Hanberry testified she was with Petitioner when he committed the robberies and assault. Petitioner's fingerprint was on the BB-gun, and one of the stolen items was found in his pocket when he was booked into the jail.  Further, Petitioner placed himself in the truck from 7:20 p.m. to the time he was arrested.  Deputy Knotts testified that the 911 call from the first robbery was received at 7:29 p.m., and Deputy Ard testified he stopped Petitioner in the truck approximately forty-five minutes later.  Petitioner admitted that items stolen from the second robbery were in the truck when he was in it.  In light of this evidence, as well as defense counsel's eliciting testimony from Ms. Butler that undermined the credibility of her identification testimony, Petitioner failed to show that defense counsel's failure to seek exclusion of the testimony prejudiced him in the Strickland sense.

Petitioner has not demonstrated that the state court's adjudication of this claim was contrary to or an unreasonable application of Strickland.  Therefore, he is not entitled to relief on Ground Five.

F.      Ground Six: "Ineffective assistance of counsel for failing to introduce into evidence Petitioner's cell phone or cell phone records which would support defense [sic] and establish Petitioner's actual innocence, violating Petitioner's constitutional rights and contrary to clearly established federal case law.

Petitioner contends defense counsel was ineffective for failing to admit as evidence Petitioner's cell phone records (doc. 10 at 14–15).  Petitioner alleges his phone records would have "verified Petitioner's phone call and time to be picked up," and verified the time he left the Oakcrest Lounge (*id.* at 14).  He contends this evidence would have corroborated his defense that he was in the truck after the robberies occurred (*id.*).

Respondent concedes Petitioner exhausted this claim by presenting it in his Rule 3.850 motion (doc. 19 at 45).  Respondent contends the state court's adjudication of the claim was not contrary to or an unreasonable application of clearly established federal law (*id.* at 45–47).

1.      Clearly Established Federal Law

The Strickland standard, discussed *supra*, governs this claim.

2.      Federal Review of State Court Decision

Petitioner presented this issue in Claim 5 of his Rule 3.850 motion (Ex. J at 93).  The state circuit court adjudicated the claim as follows:

Next, Defendant alleges that his counsel should have subpoenaed the records for his cellular telephone.  Defendant alleges that had counsel obtained the records, "the jury then would have had the opportunity to hear defendant's Co-defendant, Travis Maderson[,] calling Defendant's phone for a ride to pick him and Bashonda Hanberry up from Burger King.  And the time on Defendant's phone would have matched up to the same time Defendant gave at trial."  Defendant also alleges that the time that he left Oak Crest Lounge "was on Defendant's screen saver."

Obtaining Defendant's telephone records would not have allowed the jury to "hear" any conversation between Defendant and his co-defendant, as Defendant does not allege that the conversations were recorded.  At best, the records could have shown the time at which Defendant's telephone received an incoming call purportedly from his co-defendant.  However, Defendant does not explain how such information would have assisted his case.  Defendant does not allege whether the telephone call in question took place from a cellular telephone or a landline telephone.  If the telephone call came from another cellular telephone, the call could have been made from any location, whether Burger King or elsewhere.  If the telephone call came from a landline located at the Burger King, the call could have been placed by anyone, whether the co-defendant or someone else.  Defendant has not shown that the records of incoming and outgoing calls on his own telephone would have proven anything more than that he received a telephone call at the time that Defendant alleges that he received the call.  The telephone records Defendant references could not have indicated to the jury who made the call, from where, or what was discussed.  Therefore, Defendant has failed to show how the absence of this information at trial prejudiced him.

Additionally, the Court finds that Defendant has failed to make his allegation with regard to the screen saver on his telephone facially sufficient.  Although Defendant alleges that the screen saver would have verified his whereabouts, Defendant does not explain how the screen saver on his telephone could have verified the time at which he left the Oak Crest Lounge.  Without more information, the Court cannot properly evaluate Defendant's allegation.  Therefore, the "screen saver" allegation must be denied as facially insufficient.

(Ex. J at 183–84).  The First DCA affirmed the circuit court's decision (Ex. K).

As the state court found, Petitioner failed to show that his cell phone records would have proven anything more than that he received a telephone call at the time he alleges he received it. Even if Petitioner's cell phone records would have corroborated his testimony that Steve Fogie called him at approximately 7:20 p.m. when he delivered his truck to Petitioner at the Oakcrest Lounge, and Travis Maderson called Petitioner at 7:21 p.m. asking for a ride (see Ex. C at 213–16),

the records would not have corroborated Petitioner's defense that he was not in the truck until <u>after</u> the robberies occurred.  All of the testimony regarding the timing of the robberies suggested the robberies occurred after 7:20 p.m, when Petitioner admitted he was in the truck.  The 911 call from the Stone robbery was received by law enforcement at 7:29 p.m., which substantially corroborated Mr. Stone's testimony that he was robbed between 7:30–8:00 p.m.  The second robbery victim, Ms. Traylor testified she was robbed between 8:00–8:30 p.m.  Deputy Ard testified he stopped the truck, which Petitioner admitted he was driving, approximately forty-five minutes after the BOLO issued from the 911 call at 7:29 p.m.

The state court reasonably determined that Petitioner failed to show deficient performance and prejudice with respect to defense counsel's failure to introduce Petitioner's cell phone records at trial.  Therefore, he is not entitled to relief on Ground Six.

G.      <u>Ground Seven:  "Ineffective assistance of counsel for failing to request robbery with a weapon as a lesser included offense, one step removed form [sic] the charged offense, and for failing to argue as an alternate defense robbery with a weapon where the alleged deadly weapon was a BB gun, violating Petitioner's constitutional rights and contrary to clearly established federal case law."</u>

Petitioner contends defense counsel should have argued that the BB gun was not a deadly weapon, only a weapon, and counsel should have requested a jury instruction on the lesser included offense of robbery with a weapon (doc. 10 at 16).  He contends if counsel had done so, there is a reasonable probability the jury would have convicted him of the lesser included offense (*id.*).

Respondent concedes Petitioner exhausted this claim by presenting it in his Rule 3.850 motion (doc. 19 at 47–48).  Respondent contends the state court's adjudication of the claim was not contrary to or an unreasonable application of clearly established federal law (*id.* at 48–49).

1.      Clearly Established Federal Law

The <u>Strickland</u> standard, discussed *supra*, governs this claim.

2.      Federal Review of State Court Decision

Petitioner presented this issue in Claim 9 of his Rule 3.850 motion (Ex. J at 104–06).  The state circuit court adjudicated the claim as follows:

In this ground, Defendant alleges that his counsel was ineffective for failing to request a jury instruction on robbery with a weapon, a lesser-included offense. The Court does not find any merit in this argument as the jury was instructed on that

crime.  Also, that lesser-included offense was listed as an option on the jury verdict form.  Defendant failed to show, therefore, that any error occurred, that his counsel was deficient, or that he was prejudiced.

(Ex. J at 188) (footnote omitted).  The First DCA affirmed the circuit court's decision (Ex. K).

The state court record confirms that the jury was instructed on the lesser included offense of robbery with a weapon, and the verdict form listed the lesser included offense of robbery with a weapon (Ex. A at 38–39, 60, Ex. C at 271).  Additionally, defense counsel argued during closing that the BB gun did not qualify as a deadly weapon (Ex. C at 252).

The state court reasonably determined that Petitioner failed to show that counsel was deficient or that he was prejudiced by the alleged deficiency.  Therefore, Petitioner is not entitled to relief on Ground Seven.

## IV.   CERTIFICATE OF APPEALABILITY

As amended effective December 1, 2009, § 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted).  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of  new Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.    That the amended petition for writ of habeas corpus (doc. 10) be **DENIED**.

2.    That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this <u>18</u><sup>th</sup> day of August 2014.


<u>/s/ Elizabeth M. Timothy</u>
**ELIZABETH M.  TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* **28 U.S.C. § 636;** <u>United States v. Roberts</u>**, 858 F.2d 698, 701 (11th Cir. 1988).**